[No. 26215. Department One. January 29, 1937.]

J. C. WAX, *Respondent*, v. NORTHWEST SEED COMPANY, *Appellant*.[1]

[1]Reported in 64 P. (2d) 513.

*Palmer, Askren & Brethorst (B. E. Lutterman,* of counsel), for appellant.

*Poe, Falknor, Falknor & Emory,* for respondent.

GERAGHTY, J.—This action was brought by the plaintiff, J. C. Wax, doing business under the trade name of N. T. Wax Grocery Company, at Amory, Mississippi, to recover damages for the breach of an alleged contract for the sale by the defendant, Northwest Seed Company, of Seattle, of a quantity of mixed hairy vetch seed.

In his amended complaint, the plaintiff alleged that the defendant, through its agent, E. M. Hall, doing business under the trade name of Hall Brokerage Company, at Memphis, Tennessee, agreed to sell to the plaintiff, and the plaintiff agreed to buy, thirty tons of mixed hairy vetch seed at a price of $5.10 per hundred pounds at the point of shipment, delivery to be made after harvest, about August 15, 1934. It is alleged that the defendant violated its contract in that it neglected and refused to make delivery of the seed as agreed on, to the plaintiff's damage in the sum of $2,856.

In its answer, the defendant denied the alleged contract and, by way of an affirmative defense, alleged that, on June 9, 1934, it confirmed by letter a sale to the Hall Brokerage Company, subject to pro rata delivery in the event of a short crop. It also pleaded a custom in the seed trade that a sale of garden or vetch seed to be grown in the future is subject to pro rata delivery in case of crop failure.

After trial to the court, findings of fact were made

favorable to the plaintiff. The court found that a contract for the unconditional delivery of thirty tons of mixed hairy vetch seed had been entered into by the parties through an exchange of telegrams, as alleged in the complaint, and that the contract was breached by the defendant to the plaintiff's damage in the sum of $1,890. Judgment was accordingly entered in favor of plaintiff. The defendant appeals.

The appellant contends as grounds for reversal: (1) That there was no valid contract; (2) that, if there was a contract, it was subject to pro rata delivery; and (3) that respondent failed to prove damages.

As to the first contention, the essential facts are these:

On June 4, 1934, the broker (who will be referred to as Hall rather than by his trade name) received a telegram from the appellant giving quotation on a car of mixed hairy vetch seed, about eighty-five per cent hairy, at $5.10 per hundred. The same day, Hall wired appellant to inquire if it could confirm hairy vetch at seven cents, to which appellant answered by wire on the 5th: "Can only offer firm today mixed hairy vetch. . . ." On the 6th, Hall received the following telegram from the respondent: "Quote car hairy vetch also mixed car vetch and winter peas." Hall replied to this wire on June 7:

"Answering offer subunsold car mixed hairy vetch approximately eighty-five percent hairy five ten fob Oregon straight hairy seven cents firm bid might shade dime. . . ."

On receipt of this wire, respondent communicated with Hall by telephone, and gave him an order for thirty tons of mixed hairy vetch, and on the same day Hall wired appellant:

1934 JUN 7 AM 8 47
"CA41 50 DL XU - MEMPHIS TENN 7 1019 A
NORTHWEST SEED COMPANY
SEATTLE WASH

 SOLD N T WAX GROCERY COMPANY AMORY MISSISSIPPI
THIRTY TONS MIXED HAIRYVETCH TO BE ABOUT EIGHTY FIVE
PERCENT HAIRY BALANCE COMMON HUNGARIAN FIVE TEN
FOB NEWCROP NORMAL GERMINATION SHIPMENT AFTER HAR-
VEST ABOUT AUGUST FIFTEENTH CONFIRM. . .
 HALL BROKERAGE COMPANY."

Although this telegram was sent from Memphis at 10:19 a. m. on the 7th, it was received at Seattle at 8:47 a. m.; the earlier hour of its receipt is explained by the difference in time between the two cities.

On the morning of the 8th, at 9:32 a. m., the respondent wired Hall: "Please advise if vetch has been booked," and at 11:38 a. m., the same morning, again wired: "If unable confirm vetch by one o'clock we must place order elsewhere," to which Hall replied by wire later on the same morning: "Answering expect have confirmation your cars shortly will phone wire then." On June 9th Hall received the following wire from the appellant: *"Concerned* sale thirty tons mixed hairy vetch." It is obvious that the word "confirmed" rather than "concerned" was intended to be used in the telegram. This message was lodged in the telegraph office in Seattle sometime on June 8th for night message delivery, and was received in Memphis on June 9th at 12:46 a. m. At what later time it was delivered to Hall is not clear, but at 8:59 the same morning, Hall wired respondent: "Just received confirmation thirty tons mixed vetch five ten . . ." On the same day, June 9th, Hall forwarded to respondent by mail a statement of the sale indicating firm booking of the order. Also on the 9th, appellant wrote a letter to Hall, saying in part:

"We were very glad to be able to confirm sale to you of thirty tons mixed hairy vetch . . . We are very sorry we could not do anything on the straight hairy vetch . . . "

This letter was written on the ordinary letter head of the appellant, having printed at the head of the page in small type certain conditions, including:

"In event of short crops, all orders for growing crop shall be 'pro rata' delivery and in case of complete failure, we shall not be held liable."

Enclosed with the letter was a formal memorandum of the sale to Hall reciting sale of thirty tons mixed hairy vetch seed, "subject to pro rata delivery in the event of short crops, to be shipped to N. T. Wax Grocery, Amory, Miss." Appellant's letter referred to the fact that confirmation had been made direct to Hall and inquired if he wished confirmation to respondent also.

On June 20, 1934, in response to Hall's request, the appellant wrote respondent: "We enclose herewith confirmation covering thirty tons mixed hairy vetch for shipment after harvest 1934." With this letter was attached sales slip, omitting formal parts, as follows:

"30 tons mixed hairy vetch 5.10—85% hairy vetch balance Hungarian & common—normal Germ. Price per hundred pounds F. O. B. Oregon shipping point. Shipment about August 15, 1934. Subject to pro rata delivery in the event of short crops. Sale through Hall Brokerage Co."

Some days later after receipt of this letter and enclosure, respondent wrote appellant:

"Northwest Seed Co. June 28th, 1934.
Seattle, Washington
Gentlemen:
"On June 9th we purchased from you through your agent at Memphis, Tenn., the Hall Brokerage Co., 30 tons mixed hairy vetch to be 85% hairy balance com-

mon Hungarian, new crop, normal germination, sacked even weight 100 lb. new bags, shipment after harvest 1934, about Aug. 15th arrival draft with inspection, firm booking, at $5.10 per hundred pounds, fob shipping station.

"We are in receipt of your letter inclosing contract of this sale with notation that this order was booked on a pro rata crop basis.

"This is to advise that this car of vetch was booked as per above specifications with your agent and nothing was said about any pro rata basis for delivery, we do not know what private agreement you have or may have had with your agents, neither does this make any difference to us, we are relying on our contract with them as originally accepted and in the event you do not make full delivery of this car, we will go in the market and buy any vetch short of your delivery to make up the 60,000 lbs. and charge you with the difference in price paid for same and the price our contract with you calls for, we do not buy vetch in less than 60,000 lb. cars in order to get the advantage of the least freight rate on same, we do buy vetch and peas at times on pro rata crop delivery but we also buy it on firm sales, as in this case.

"If you are not going to make full delivery of this car, please advise us immediately so that we may be able to protect ourselves and make the loss to you as light as possible.

"We await your reply, and remain,
Yours very truly,
N. T. WAX GROCERY COMPANY."

Much subsequent correspondence ensued, ending only with the institution of this suit.

Whether or not a binding contract was made by the parties, is dependent upon the legal effect given to the telegrams of June 7th, 8th and 9th above quoted.

In making an offer, the offeror may fix a time limit for acceptance, and an acceptance received after the time fixed is ineffective to create a binding contract. The rule as to a belated acceptance is given in Restatement of Law on Contracts, § 73, as follows:

"An offeror who receives an acceptance which is too late or which is otherwise defective, cannot at his election regard it as valid. The late or defective acceptance is a counter-offer which must in turn be accepted by the original offeror in order to create a contract."

It is also a rule that an offer may be withdrawn or modified before an acceptance.

Now, we have here an offer made by the respondent on the morning of the 7th. Before an acceptance by appellant, respondent, on the morning of the 8th, by wire modified or conditioned his offer by requiring acceptance by one o'clock that day. While Hall answered that he expected confirmation shortly and would advise respondent, this telegram was not acknowledged in any way by respondent indicating an extension of the time. From the fact that he sent the two wires that morning, it is evident he was much concerned for an early answer. Apart from this, the language of Hall's telegram, "confirmation your cars shortly," could very well be taken to imply that confirmation would be had before one o'clock. The respondent received Hall's wire on the 9th informing him of receipt of the confirming wire from appellant, but no acknowledgment was made of this wire.

Respondent contends that, as the offer was made by telegraph, that agency was designated for receipt of an answer, and since the record does not disclose at what hour on the 8th the message was delivered to the telegraph office, it will be presumed in aid of the judgment that it was delivered not later than one o'clock, the time limit fixed for acceptance.

The answer to this contention is that, while the telegram was left at the telegraph office sometime before midnight on the 8th, by appellant's specific direction it was not to be delivered until the 9th.

The trial court seemed to be of the view that

the respondent's silence after receipt of Hall's wire advising confirmation, amounted to a waiver of the time limit. But respondent's silence did not create an acceptance of what was in effect a counter offer.

"Nothing is more fundamental than that in bilateral contracts both parties must be bound, or neither; and that in unilateral contracts, the performance requested must be simultaneous with the creation of any obligation on the part of the promisor. To allow a waiver of a defect of an acceptance is virtually to say that the acceptance is binding on the acceptor, or may be treated as binding by the offeror (which amounts to the same thing) from the time when it is made though the offeror himself is still perfectly free to assert that the acceptance was defective, and though no estoppel forbids the acceptor from showing the true facts. In truth, a defective acceptance can only amount to a counter-offer, and the only way a contract can be formed is by acceptance of the counter-offer in the same way as if it were an original offer. 1 Williston on Contracts, § 92.

"We have to inquire whether an acceptance after the time limited, or, in the absence of an express limitation, after the lapse of a reasonable time, imposes upon the person making the offer any obligation. The theory of the court below seems to have been that it does. But in our opinion it does not. The offer, unless sooner withdrawn, stands during the time limited, or, if there is no express limitation, during a reasonable time. Until the end of that time the offer is regarded as being constantly repeated. . . . After that there is no offer, and, properly considered, nothing to withdraw. The time having expired, there is nothing which the acceptor can do to revive the offer, or produce an extension of time." *Ferrier v. Storer*, 63 Iowa 484, 487, 19 N. W. 288, 50 Am. Rep. 752.

By way of comment on the rule announced above, it is said by Williston:

"Certainly where the offer fixes a time within which it must be accepted this reasoning is unanswerable,

since the offeree must know that his acceptance is not within the terms of the offer.'' 1 Williston on Contracts, § 93.

The respondent did nothing that could be construed as a waiver in the time intervening between receipt of the telegram on the 9th and receipt of appellant's letter of the 20th. After receiving this letter stipulating a pro rata delivery, it was to his advantage to take the position that there had been an acceptance of his offer; but if the conditions had been such that it would have been to his advantage not to recognize the belated acceptance, he would have been at liberty to do so. There was not here the mutuality of obligation necessary to a bilateral contract.

Our conclusion that there was no contract disposes of the case. The judgment is reversed, and cause remanded with direction to dismiss.

STEINERT, C. J., MAIN, MILLARD, and BLAKE, JJ., concur.