**William A. SWICK, Appellant and Cross-Appellee,**

v.

**SEWARD SCHOOL BOARD, Appellee and Cross-Appellant.**

**Nos. 212, 213.**

Supreme Court of Alaska.

Feb. 26, 1963.

---

9. Section 55-3-6 ACLA 1949.

Peter B. Walton, Connolly & Walton, Anchorage, for appellant and cross-appellee.

Donald A. Burr, Burr, Boney & Pease, Anchorage, for appellee and cross-appellant.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

NESBETT, Chief Justice.

A 1957 act of the territorial legislature provided that school boards may hire teachers and issue contracts to them for the ensuing school year any time after January 1 and shall notify them of nonretention in writing on or before March 15. The act also provided that if written notification of nonretention, together with a clear statement of cause including a bill of particulars for such nonretention was not issued before March 15, the teacher's contract should be continued for the ensuing school year, including any earned salary increment.[1]

■ The controlling question we must decide in this appeal is whether the 1958–1959 teaching contract of appellant and cross-appellee Swick with appellee and cross-appellant Seward School Board was ultimately renewed or rejected or abandoned under the following facts: Responding to a form inquiry from the board in February of 1959 Swick indicated, by crossing out the words "do not", that he did desire to remain in his teaching position with the board for the 1959–1960 school year; the board reelected Swick to his teaching position on March 10, 1959; the board did not at any time give Swick notice of nonretention; on March 26, 1959 the board delivered to Swick a proposed teaching contract for the 1959–1960 school year containing a validation clause which Swick read and which

1. In pertinent part, SLA 1957, ch. 71, § 1 (§ 37-5-11 ACLA Cum.Supp.1957) states:
   "School Boards * * * may hire administrators and teachers * * * and issue contracts to same for ensuing school year anytime after January 1, and shall notify administrators and teachers of non-retention in writing postmarked or delivered on or before March 15. * * * In the event that written notification of non-retention together with a clear statement of cause including a bill of particulars for such non-retention is not issued before March 15, the administrators' and teachers' contracts shall be continued for the ensuing school year in conformity to the Territorial and local salary stipulations including any annual increments."
   Note—SLA 1957, ch. 71 was repealed, reenacted and supplemented by SLA 1960, ch. 92. However, the particular provisions with which we are concerned in this case were not changed.

stated that in order to be valid the contract must be returned to the office of the superintendent by April 10, 1959; the board later notified Swick that the validation date had been extended to April 22, 1959; on May 11, 1959, Swick's contract not having been returned, the board met and voted not to accept the overdue contract; on May 12, 1959 Swick was notified in writing by the board that since he had elected not to return his contract by April 22 his teaching position had been declared vacant; Swick returned the signed contract to the superintendent by registered mail on September 8, 1959.

The trial court found that since the board had not given Swick notice of nonretention prior to March 15, and had not tendered him a teaching contract prior to that date, that the existing employment contract was automatically renewed by operation of law for the 1959–1960 school year only, at an annual salary of $7375, which included an annual increment. The court also found that the validation clause on the proffered contract had not been submitted to the Commissioner of Education and concluded as a matter of law that the board's "attempt to terminate and dismiss the plaintiff [Swick] as a teacher was wrongful and without legal effect." Swick was found not entitled to the entire salary of $7375 for the 1959–1960 school year but was awarded judgment for the sum of $4000 as damages for the board's breach of contract. Swick appealed and the board cross-appealed.

Swick contends that a proper interpretation of the law and the facts is that his 1958–1959 teaching contract was automatically renewed for the 1959–1960 school year and for each successive school year until he was given notice of nonretention or until he resigned. He also claims that error was committed in not awarding him his full salary for the 1959–1960, 1960–1961 and 1961–1962 school years with interest.

The board contends that the act does not preclude it from requiring separate written contracts for each year that the teacher is employed; that it has a right to set a reasonable return date for the contract and that Swick's failure to return his signed contract by the return date amounted to a voluntary abandonment and rejection of whatever contractual relations existed between him and the board.

It is our view that when March 15, 1959 passed without notice of nonretention being mailed or delivered to Swick, that he acquired the right to continue in his teaching position with the board for the 1959–1960 school year under the same contract provisions as were contained in his 1958–1959 contract plus any earned salary increment. By not giving notice of nonretention to Swick prior to March 15, 1959 the board waived its right to urge any of the "causes" specified in SLA 1957, chapter 71, section 2 as grounds for refusing to enter into a teaching contract with Swick for the 1959–1960 school year.[2] But the rights acquired by Swick did not divest the board of the right to require that he enter into a written contract for the 1959–1960 school year containing the same terms as his 1958–1959 contract plus earned salary increment. The board had the right to submit such a written contract to Swick after March 15, 1959 and require that he either accept or reject the contract within a reasonable time. We hold that the April 10 return date on the contract delivered to Swick on March 26 was reasonable as was the board's extension of the return date to April 22.[3] Swick's failure to return the signed contract by April 22 created legal grounds for assumption by the board that Swick had rejected or abandoned his right to a teaching contract for the

2. This section provides that the term "cause" shall be based solely upon: incompetency, which is defined; immorality, also defined, and substantial non-compliance with the school laws, regulations of the Territorial Board of Education or other governmental agency. It is also provided that reductions of staff occasioned by decrease in school attendance may warrant nonretention in the absence of any of the above "causes".

3. Ward v. Board of Education, 36 Ohio App. 557, 173 N.E. 634 (1930).

1959–1960 school year. The action of the board on May 11, 1959 construing Swick's failure to return his signed contract within the time allowed as an abandonment or rejection of his contract rights was a correct interpretation of the law.

We are unable to accept the argument that because the board did not give notice of nonretention by March 15 that this automatically created a contract for the 1959–1960 school year which could not be affected in any manner by board policy that all teachers' contracts be in writing.

■ SLA 1957, chapter 71 was designed to aid teachers by introducing stability and certainty in their employment relations with school boards. If it was a board's intention not to retain a teacher for the ensuing school year, timely notice and a statement of cause was required to be given. The right to a full hearing was accorded the teacher. This requirement of the law was intended to protect teachers from unjustified refusal to retain them. The time schedule prescribed by the act for holding the hearing could result in a decision before the end of the existing school year so that both parties would be timely advised with respect to their employment problem for the coming school year.[4]

However, school boards also acquired certain rights under the act. Some of these were: the right to hire qualified teachers and issue contracts to them for the ensuing school year;[5] the right to hire superintendents and issue contracts for periods up to three years[6] and the right to adopt teacher tenure regulations on a district option basis.[7]

That the act was intended to permit the use of employment contracts with the teacher is obvious from its wording which specifically provides that boards may hire teachers " * * * and issue contracts to same for ensuing school year * * *." This has been the law in Alaska since 1949.[8] Swick testified that for each of the nine years he had taught in Skagway and Seward he had entered into a separate written contract. A former Territorial Commissioner of Education testified that contracts with stated return dates are customarily used in other states. Without a contract of employment the relationship that is to exist between a board and a teacher would remain undefined in many important aspects. Certainly the provisions of the act alone are not sufficient to define the relationship that is to exist for the coming year in those cases where a board does not give notice of nonretention prior to March 15. No doubt this is why the legislature provided that in the event notice of nonretention was not given by March 15 the "teachers' contracts shall be *continued* for the ensuing school year * * *." (Emphasis ours.)

A study of the standard form of contract which was used by the board and which was submitted to Swick in this case will at once reveal its usefulness. In the first five paragraphs the teacher contracts that he will: perform the duties of a teacher for the stated school year which is defined, swear that he is a United States citizen, swear to a non-communist oath, abide by the laws of Alaska, the Rules and Regulations of the Seward School Board and instructions of the superintendent and authorize appropriate salary deductions. In the next two paragraphs the board contracts to pay a stated annual salary which is defined on a per diem basis. The last eight paragraphs are mutual covenants defining the term "teacher", making the production of current medical and teaching certificates a condition to the payment of salary, giving the board contract termination rights should the teacher fail to discharge his duties or for unbecoming

4. SLA 1957, ch. 71, § 3 (§ 37–5–13 ACLA Cum.Supp.1957).

5. SLA 1957, ch. 71, § 1 (§ 37–5–11 ACLA Cum.Supp.1957).

6. SLA 1957, ch. 71, § 4 (§ 37–5–14 ACLA Cum.Supp.1957).

7. SLA 1957, ch. 71, § 5 (§ 37–5–15 ACLA Cum.Supp. 1957).

8. SLA 1949, ch. 74, which was repealed and reenacted with more particularity by SLA 1957, ch. 71.

conduct, requiring written notice and a hearing of the type required when notice of nonretention is given, providing for suspension from duty during hearing and until final decision, providing for contract termination by the board on several other conditions and lastly providing for revocation of the teacher's certificate for violation of the contract.

It is the above type contract, containing the minimum standard conditions prescribed by the Territorial Commissioner of Education [9] that the legislature had in mind should "continue" in the event notice of nonretention was not given by March 15.

It is obvious though, that the right to "continue" under such a contract, is a right enforceable only by the teacher. It is a right which arises by operation of law simply because the board did not give timely notice of nonretention. The board at this point in the new relationship does not have an enforceable right to require the teacher to perform his duties for the ensuing school year, merely because it failed to give notice of nonretention. Although the teacher has a right to continue under the existing contract for the following year, he may not desire to do so. This is his privilege. On the other hand, the board is not required to wait until school commences in the fall to learn whether the teacher chooses to exercise his right. Before the board can have

legal assurance that the particular teaching position will be filled at the commencement of the next school year it must obtain an agreement from the teacher.

It follows from the foregoing that the 1958–1959 teaching contract between Swick and the board could not "continue" unless Swick consented to its continuance. Swick had a right to insist on the continuance of the existing contract and the board had the obligation to offer him such a contract for the 1959–1960 school year. This it did on March 26, 1959. Without Swick's signature to the contract, no contractual relationship could "continue" within the meaning of the statute. The board was absolved of any obligation to Swick under the statute when it tendered him a contract identical in terms with his previous year's contract plus an earned salary increase and Swick failed to accept it by signature and return within a reasonable time.[10]

The contract tendered to Swick contained a typewritten notation in the upper left hand corner of the first page reading:

"To be valid this agreement must be returned to the office of the Superintendent not later than April 10, 1959." [11]

The evidence was uncertain whether a contract form containing such a validation condition had been submitted to and had the approval of the Commissioner of Education

9. Regulation 23 of the Regulations of the Territorial Commissioner of Education then in force required that all teachers' contracts for Alaska public schools must contain minimum standard contract provisions which were specifically set out in the regulation. Standard contract forms were provided by the Commissioner of Education. School districts were empowered to establish their own contract form provided it contained the minimum standard contract provisions specified and had been approved by the Attorney General and the Commissioner of Education.

10. The 1958–1959 teaching contract could have been literally continued by the addition of an addendum for Swick's signature stating that he agreed to be bound by its terms for another year. The

board, as of March 15, 1959 was automatically bound by this contract, subject to Swick's acceptance. The legal effect was no different merely because the board prepared a new contract form embodying the same terms. Whether an addendum or a new document was used, the board had the right to require a timely acceptance.

11. Swick's testimony on direct examination was that his failure to return the contract by April 22 was an "oversight" caused by the press of teaching duties; on cross-examination he stated that his reason for not returning the contract was that there was a teacher's salary bill pending in the legislature which, if enacted, would have affected the salary provided for in the contract.

and the Attorney General.[12] The trial judge found that such approval had not been obtained and on the basis of this finding concluded that the board's action of May 11, 1959 declaring Swick's teaching position vacant was without legal effect.

We hold that it made no difference in this case whether the validation clause had or had not been submitted for approval. There was no evidence that the Commissioner of Education or the Attorney General had *disapproved* the use of such a clause. Inherent in the board's right to contract with its teachers was the right to establish a reasonable time within which an offer to contract could be accepted.[13]

As has been previously stated, the intent of the act was to promote certainty and fairness in the employment relationship between teachers and boards. It contemplated and provided for the use of contracts. The Commissioner of Education prescribed certain minimum conditions that all such contracts should contain. If, after having been timely offered the contract to which he had become entitled, a teacher fails to accept or reject it within the reasonable time allowed, the board must be released from its obligation. To permit the teacher to hold the contract until the beginning of the next school year before signing and returning it, defeats one of the main purposes of the act—that of permitting a board to acquire timely notice of the teacher's intentions for the ensuing school year.[14]

In reaching the foregoing conclusions we have not been influenced by the fact that the form questionnaire received by Swick in February was returned by him marked to indicate his intention to remain in his teaching position for the coming year. In our view the questionnaire was for the convenience of the board so that it could con-

sider for re-election only those teachers who had indicated a desire to remain. Swick indicated a desire to retain his teaching position for another year and was re-elected by the board. Although these events laid the foundation for a contract they did not create a contract.

We have been urged in Swick's brief to consider that he was an officer in a newly formed branch of the American Federation of Teachers; that in such capacity he was actively engaged during the months of April and May in representing the interests of four teachers who had been wrongfully discharged by the board; that a lively public meeting of the board was held on May 8, 1959 at which time Swick vigorously defended the legal position of the teachers; that as a result the board sought 'vengeance on him and seized on the fact that he had not returned his contract by April 22 to declare his teaching position vacant on May 11, 1959.

This theory was not advanced by Swick in his original complaint, nor in his amended complaint, nor was discrimination recognized as an issue in the pre-trial order of the court. After considerable testimony had been admitted during the trial concerning the claimed discrimination, the trial judge finally ruled that it was immaterial and irrelevant since it had not been raised as a legal issue and ruled that the only question before the court was one of contract. Discrimination was not included in Swick's statement of points on appeal and we therefore decline to consider it.[15]

The judgment is reversed and the case remanded to the trial court for the entry of findings consistent with the views expressed in this opinion and a judgment in favor of the Seward School Board.

12. See note 9 supra.

13. See Wax v. Northwest Seed Co., 189 Wash. 212, 64 P.2d 513, 515 (1937).

14. We have reviewed the authorities cited by the parties but find none sufficiently in

point to be instructive on the particular question raised in this case.

15. Supreme Ct.R. 9(e), Veal v. Newlin, Inc., Opinion No. 53, 367 P.2d 155, note 3 (Alaska 1961).