James A. WATTS and Walter B. Blue,
Appellants,

v.

SEWARD SCHOOL BOARD and Board of
Education, Appeal Hearing Com-
mittee, Appellees.

No. 427.

Supreme Court of Alaska.

May 12, 1969.

---

Joe P. Josephson, Pollock, Josephson &
McNealy, Anchorage, for appellants.

Warren W. Matthews, Jr., Burr, Boney
& Pease, Anchorage, for appellees.

Before NESBETT, C. J., and DIMOND
and RABINOWITZ, JJ.

NESBETT, Chief Justice.

This is the third time this case has been
before us.

Our last decision was a comprehensive
de novo consideration of all of the issues
raised by appellants.[1]  The judgment en-
tered as a result of that decision was vacat-
ed by the Supreme Court of the United
States on June 3, 1968, with a remand to
this court for further consideration in the
light of the June 3, 1968, decision of that
court in Pickering v. Board of Education
of Township High School District 205,
Will County, Illinois, 391 U.S. 563, 88 S.Ct.
1731, 20 L.Ed.2d 811 (1968).

In *Pickering* a newspaper published a
letter to the editor from a high school
teacher which discussed a proposed prop-

1.  Reported in 421 P.2d 586 (Alaska 1967).

erty tax intended to be used for educational purposes. The proposed tax had just been defeated at an election. Other letters had already been written to the newspaper by the school superintendent and the teachers' organization. Pickering's letter was a response to these letters and joined in the discussion of the subject of the need for additional funds for educational purposes. The letter was critical of past education fund allocations made by the school board. Pickering's dismissal by the school board was affirmed by the Supreme Court of Illinois.

In reversing and remanding the judgment the Supreme Court of the United States stated that teachers may not constitutionally be compelled to relinquish first amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the schools in which they work. The court stated, however, that the state does have interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of citizens in general.

The court said that the problem in each case is to balance the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the state as an employer, in promoting efficiency in the schools. The court held that it would not be appropriate in *Pickering* to attempt to lay down a general standard against which all statements could be judged, but stated that it would indicate some "general lines" for analysis of other factual situations.

The first factor mentioned by the court in *Pickering* was that the statements made by the teacher were not directed toward any person with whom he would normally be in contact in the course of his daily work as a teacher. Therefore, there was no question of maintaining discipline by an immediate superior or harmony among co-workers. The teacher's employment relationship with the board and to a lesser extent with the superintendent were not the kind of close working relationship which required personal loyalty and confidence to their proper functioning.

In attempting to apply the above guideline to the case before us we shall consider those statements or accusations made in the "Open Letter To The Seward School Board" which can be related to the *Pickering* standard. In a preamble paragraph the letter alleged that the incidents cited were "definitely detrimental to the morale of our teaching staff and the effectiveness of the local educational system." The letter was given widespread public distribution at the same time that copies were delivered to the superintendent and members of the school board. (421 P.2d at 592)

Item 2 of the open letter accused the administration of failing to create and maintain harmony in the school with the result that there was tension and friction among the pupils.

Item 4 accused the administration, which under the circumstances could only have been the superintendent, of ordering the custodian to do technical electrical work "beyond his skill in a dangerous building." Board Finding No. 11 was that the superintendent had not ordered the custodian to do technical electrical work beyond his ability.[2]

Item 5 of the open letter accused the superintendent of threatening "to get one-third of the faculty this year, and half of the remainder next year"; of tampering with the livelihood of teachers, taxpayers, property owners, and of "upsetting the school system" and of "bringing teachers and others into public disgrace and disrespect." Finding of Fact No. 12 of the board was that the superintendent did not make the statements alleged in Item No. 5 and that the charge was false. The board specifically stated in the finding that it had made the finding after resolving the direct

2. 421 P.2d at 594.

conflict in testimony between that given by Superintendent Fabricius and appellant Watts in favor of Superintendent Fabricius and that the conflict had been resolved in part upon observation of the demeanor of the two witnesses.

In Finding No. 13 the board stated that the allegation contained in Item 5 of the open letter to the effect that the superintendent had jeopardized property investments of several people without legitimate cause referred to the non-retention of a Seward school teacher named Charles Brown. The finding stated that Mr. Brown was not retained by the board for the year 1959 through 1960 for cause, because of his inability to maintain discipline among his students. The board specifically stated that the allegation that the superintendent had jeopardized the property investments of several people without legitimate cause was false.

Item 6 of the open letter accused the superintendent of provoking the resignation of an outstanding teacher by forbidding him to ride in the school bus in violation of rules and regulations and by the apparent authoritarian mishandling of the teacher's resignation impaired the teacher's chances for a teaching position elsewhere. The result being that the school board and taxpayers were laid open to possible suit in connection with the teacher's contract.

Finding No. 14 of the board was that Item 6 had reference to the resignation of former school teacher Jack Conder. The finding stated that Mr. Conder resigned after an argument with Superintendent Fabricius during the course of which Conder was advised by the superintendent that he would have to remain at school until 4:20 p. m., as did all other teachers, and that he would not be permitted to leave at 4 p. m. in order that he might ride the school bus home. The finding stated that the superintendent did not forbid Conder to ride the school bus in violation of rules and regulations. The finding was that the statement contained in the item that the

incident seemingly constituted a violation of the intent of the rules and regulations effecting school transportation was false.

Item 7 of the open letter accused the superintendent of "dictatorial treatment of teachers, forcing them into the choice of submitting and taking it at the loss of personal dignity, or fighting back in a public spectacle."

Item 8 of the open letter accused the superintendent of speaking in a peremptory and threatening manner in the presence of a pupil to Mr. Smith.

Finding No. 15 of the board was that Item 8 referred to an incident in which a teacher named Smith argued with Superintendent Fabricius about the conduct of a study hall. The board found on the uncontroverted evidence that Mr. Smith had lost his temper and had resigned. The finding was that on all of the evidence the superintendent had not acted in a peremptory or threatening manner and that the charge contained in Item No. 8 was false.

Item 9(c) of the open letter accused the administration of overtly or covertly driving out Mr. Conder, Mr. Swick, and Mr. Smith and other teachers who had a definite contribution to make to the functions of the school.

Finding No. 16 of the board was that Mr. Smith and Mr. Conder tendered their resignations and Mr. Swick, by his own actions, failed to renew his contract and was therefore terminated. The charge that the above three teachers were driven out was found not to be supported by the record and to be false.

Item 10 of the open letter accused the superintendent of firing Mrs. Davis (his personal secretary "apparently on the basis of personal dislike rather than for dereliction of duty or inefficiency." The item charged that "this resulted in public discussion reflecting adversely on the school, and placed Mrs. Davis in the position of consulting an attorney relative to the collection of salary allegedly due her."

Although the board made no specific finding with respect to Item No. 10 the uncontroverted testimony of Superintendent Fabricius was that he had found Mrs. Davis, his secretary, to be unreliable in many respects and that after consultation with the board he had given her notice of termination at the close of the school year.

Unlike *Pickering,* appellants' statements and activities did concern their immediate superior. In the relatively small schools in Alaska, such as at Seward, the school superintendent has a close working relationship with both teachers and students which may not exist in larger areas. Here Superintendent Fabricius was actively concerned with the discipline of the two schools at Seward. He served after school hours as a student discipline detention supervisor the same as the teachers. The teachers sent a "continual stream of youngsters" to him for discipline. Fabricius dealt directly with all of the teachers; he dealt directly with teachers who were not carrying out their duties properly. Appellant Watts, in attempting to enlist teachers during school hours on school premises to get rid of Fabricius, referred to Fabricius as the teachers' "immediate superior." With only 30 teachers in the Seward School System, and with Fabricius taking the active part in the two schools that he did, with no mention ever having been made by anyone of the high school principal, it is apparent that Fabricius was more than the school system's superintendent—that he was in fact the school principal as well. Thus, considering appellants' actions in attacking and attempting to oust Fabricius, there is definitely a situation here where appellants' actions were directed toward a person with whom appellants would normally be in contact in the course of their daily work as teachers, and where a question of maintaining discipline by an immediate superior was involved.

It is also apparent that a question of harmony among appellants' co-workers was present. In addition to the statements or accusations contained in the open letter the board found that appellant Watts had solicited teachers Mr. and Mrs. Benjamin Frampton and Monty Richardson, members of the teaching faculty, to go along with a group of which Watts was a representative and whose purpose was to oust Fabricius from his position. The testimony was that the solicitations occurred on school premises during school hours, and that the solicitation was Watts' individual effort and not in any way authorized by the Seward teachers' organizations. (421 P.2d at 595) The statements and actions of appellants concerned Fabricius' relationship to the students, teachers, and staff personnel.

Many of the statements were openly derogatory of Fabricius. There was testimony that disclosed that appellant Watts had stated to a teacher, E. G. Naegel, during school hours and on school premises that, "if it was the last thing they would do they would get the superintendent."

It seems evident that these acts on the part of appellants were detrimental to harmony in the two schools. Mrs. Frampton, a teacher, said to Watts: "What has Mr. Fabricius done to deserve such a thing as this?", and she testified that in her estimation the profession of teaching was "diminished" as a result of the conversation with Watts. Watts stated, in connection with his conversation with Mrs. Frampton, that this "was a meeting of strong feelings"; that he was sorry they disagreed and that he "hoped there would be harmony again soon." In addition, the stated purpose of the open letter was to advise the Seward School Board and the public of matters that were "definitely detrimental to the morale of our teaching staff and the effectiveness of the local educational system."

We believe that what the appellants did, both in their open letter to the board and in their acts of solicitation among the teaching staff, could not help but be detrimental, not only to discipline, but also to harmony among appellants' co-workers, and to the operation of the schools.

The second factor mentioned by the court in *Pickering* was that the question

whether a school system requires additional funding is a matter of legitimate public concern on which the judgment of the school administration, including the school board cannot be taken as conclusive. On such questions free and open debate is vital to informed decision making by the electorate. Teachers are as a class the members of a community most likely to have informed and definite opinions as to how school monies should be spent. Accordingly they must be permitted to speak out freely on such questions without fear of retaliatory dismissal.

Unlike *Pickering* no question of the expenditure of school funds was involved in the case before us. None of the statements concerned matters on which the public voted. Superintendent Fabricius was not an elected official. The allegations generally were in the nature of grievances.

The third factor mentioned by the court in *Pickering* was that the only matters which were falsely stated were matters of public record which could be easily corrected by the school board and were stated in a manner which was perfectly consistent with good faith error. The court pointed out that only carelessness or insufficient information was responsible for the false statements and that the court was not presented with a situation where a teacher had carelessly made false statements about matters so closely related to the day to day operations of the school that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the true facts.

In our previous decision it was pointed out that of the various charges which were compiled, reproduced, and distributed to the public at large by appellants, six were found to be false statements of fact. All of the false statements in the charges reflected on the integrity and professional ability of the superintendent. Those concerning his overbearing and arbitrary treat-

ment of the named teachers were professionally degrading to him. All of the false statements were an indictment of the administration of the Seward School System as a whole. (421 P.2d at 599).

Unlike *Pickering* the false statements were not concerning matters of public record which could easily be corrected by the school board. Unlike *Pickering* the false statements did concern matters closely related to the day to day operations of the school. The harmful impact of the false statements proved to be difficult to counter. The private effort to discredit and cause the school board to get rid of the superintendent failed. The individual attempts of appellants to discredit Fabricius reached such a peak that all of the teachers of the Seward District Teachers Association except two signed a letter prepared by teacher Richard Winters on his own initiative addressed to the Seward School Board protesting the "character assassination" of Fabricius. Appellants then unsuccessfully attempted to get rid of the school board by recall election.[3] In our last opinion we said:

> The production and distribution of the Open Letter was a time consuming and deliberate act. The false statements contained in it were not made in heated debate. The factual basis for the charges could have been verified by appellants if they had taken the time to do so. Appellants admittedly ignored established democratic procedure for obtaining redress. Instead, they attempted to arouse and inflame the public against the Superintendent and the School Board on charges which were largely untrue. They chose to attempt to substitute the mass meeting for the orderly process of hearing and appeal. (421 P.2d at 607)

Another review of the entire record in this case has not changed our views. Appellants' false statements were not consistent

3. *See* Blue v. Stockton, 355 P.2d 395 (Alaska 1960) where this court upheld appellant Blue's contention that the Seward School Board was subject to recall.

with good faith and were made in reckless disregard of the truth.

The last factor mentioned by the court in *Pickering* was that the letter was treated by everyone except the board with "massive apathy."

The result of the statements and of the activities of appellants were not greeted with "massive apathy" in Seward. Appellant Blue admitted that the open letter had been the subject of "no small amount of controversy in the last year and a half." As has been mentioned, the open letter was merely the prelude to an unsuccessful attempt to recall the school board, which election was preceded by speeches by Superintendent Fabricius, appellant Blue, and apparently others. Shortly after publication of the open letter appellant Blue contacted at least three residents of the neighboring towns of Kenai and Soldotna in an attempt to obtain information of a derogatory nature about Superintendent Fabricius, who had been a superintendent in Kenai for six years prior to coming to Seward. (See 421 P.2d at 599)

In our previous decision we mentioned that we had reviewed the entire transcript of proceedings had before the Seward School Board and the State Board of Education, Appeal Hearing Committee and had found that there was substantial evidence to support the findings. (421 P.2d at 598) Our views have not changed. The criteria supplied by *Pickering* have been applied in another independent review of the record. Our conclusion is that the doctrine of *Pickering* can have no controlling application to the facts of this case.

In their brief appellants have argued that Seward School Board Regulation E–7 is unconstitutionally vague and overbroad and was never properly adopted. In a one paragraph discussion appellants have for the first time raised the point that the school board hearing was a denial of due process because it was not an impartial tribunal. In our opinion in Watts v. Seward School Board, 423 P.2d 678 (Alaska 1967), denying appellant's petition

for rehearing, we stated that we would not consider on appeal matters which were not first presented to the lower court. We denied appellant's request that we consider for the first time the question of the constitutionality of Seward School Board Regulation E–7. For the same reason we decline now to attempt to consider the question of the constitutionality of the hearing procedure herein.

In our opinion in Watts v. Seward School Board, 421 P.2d 586, at 601–602 we reviewed the evidence in connection with the validity of Regulation E–7, found that it had been validly adopted, and affirmed the Seward School Board's finding that appellants had violated this regulation as a separate, independent non-constitutional ground for their nonretention. Nothing in *Pickering* requires us to alter this finding which is hereby affirmed.

On pages 5 and 6 of the dissent AS 14.20.095 (1965) is quoted. This statute provides that no rule or regulation of the Commissioner of Education, a local school board, or a local school administrator may restrict or modify the right of a teacher to engage in comment and criticism outside school hours, etc. In our last opinion in this case in 421 P.2d at 605 we discussed this act of the legislature and pointed out that it could have no controlling effect on the facts of this case for the reason that it was not enacted to be retrospective and in any event was directed at the rules or regulations of a commissioner, a local school board, or a local administrator whereas in the case before us we were required to interpret and apply a state statute. We also pointed out that the new statute applied to activities conducted outside school hours whereas much of the conduct condemned in this case occurred during school hours and on school premises. At 421 P.2d at 609 we discussed the pertinent facts connected with the remand of this case by the Supreme Court of the United States in connection with Alaska statutes subsequently enacted which the dissent again now discusses.

Footnote 16 on page 7 of the dissent appears to be emphasizing an inconsistency by the majority in its last decision in connection with its consideration of Seward School Board Regulation E–7. There is no inconsistency. In 421 P.2d at 589 we pointed out that appellants had requested that the appeal be considered de novo in the light of recent United States Supreme Court decisions and that appellee had also again briefed and urged us to determine the question of whether the Seward School Board's conclusion that appellants had substantially failed to comply with Seward School Board Regulation E–7 was not a sufficient independent cause for their non-retention. We obliged both appellants and appellee in their requests. The validity of adoption and application of Seward School Board Regulation E–7 was briefed by appellee and the matter was covered in the majority's decision. On petition for rehearing appellants for the first time raised the question of the constitutionality of Regulation E–7. It was at this time that the majority used the language quoted in footnote 16 of the dissent to the effect that it would not consider matters on appeal which had not been presented and briefed in compliance with court rules. We accordingly declined to attempt to consider on petition for rehearing the matter of the constitutionality of Regulation E–7. The question of the constitutionality of Regulation E–7 had not been briefed by appellant previously, in fact has never been briefed beyond cursory comment.

On pages 8 and 9 of the dissent our colleague points out that the record in this case contains no

parallel to the contemporary activities which have convulsed, disrupted, and at times destroyed academic institutions throughout this country. * * * Nor was any evidence presented that the school board's or superintendent's, actual administration of the school system was disturbed by the conduct of appellants. For here there was no physical seizure of buildings, or school offices; no attempts made by faculty members to interfere with the actual administration of the schools or with the students' right to attend school; nor was the school board, or the superintendent, presented with a series of non-negotiable demands as an alternative to continued disruption of school administration and operation.

We agree that appellants' activities herein did not reach the aggravated proportions of present day student riots. However, we do not consider this a valid argument in support of a reversal thereby undermining the authority of and requiring all state school boards to condone such activities in the future. The activities of appellants do bear a basic similarity to present student uprisings in that in each case existing procedures for correcting grievances and bringing about needful changes have been totally ignored in favor of the method of the public confrontation. Item 1 of the open letter had admittedly already been processed in early May as a grievance and settled to the complete satisfaction of all concerned. The balance of the items in the open letter were grievances which both appellants admitted had never been presented as grievances under Regulation E–7. Although the attempted confrontation in Seward disrupted the community for over a year, it did not reach riot proportions.

On page 9 the dissent quotes the testimony of appellant Blue in response to the question of whether he thought that teachers were less entitled to complain about a school board than ordinary citizens to which Blue replied:

I think that their position is identical with perhaps this exception, that being closer to the problems that perhaps they should make extended efforts first before publicizing the thing. The very thing we did throughout our history.

The record conclusively shows that appellant Blue and appellant Watts made no "extended effort" to process any of the grievances mentioned in the open letter, with the beforementioned exception of Item 1, before publicizing them. Their testi-

mony was that none of the matters had been presented as grievances and both appellants freely admitted that Item No. 1 of the open letter was in fact not a grievance at all since it had been handled as a grievance early in May and had been settled to the complete satisfaction of everyone concerned. When asked why, if Item No. 1 had previously been settled in the usual grievance fashion, had it been included as a matter which required attention in the open letter, appellants had no reply except to state that they felt that it needed some "public discussion." The fact remains that it was presented in the open letter as an existing grievance and not presented as a settled grievance which required further "public discussion."

On page 10 of the dissent our colleague comments on the philosophy of appellant Blue and quotes him in considerable detail in that respect. The personal philosophy of appellant Blue was really not in issue at the school board hearing. While his philosophy, to the extent quoted, appears to be commendable, it should also be pointed out that the hearing produced considerable other evidence with respect to appellant Blue's philosophy which may not have been considered so commendable by the Seward School Board insofar as a teacher is concerned. For example, the record reflects that when Mr. Blue was asked if he believed in God his answer was, "Yes sir, I do." He then quickly asked that the question be reread, retracted his answer, and in response to the question as to whether or not he had ever made reference to the Bible as a book of fables answered, "No sir, I have not in those words." When asked whether he denied making a statement to that effect his answer was, "No sir, I don't, not to that general effect, but that's a distorted version."

The majority has made an independent and thorough examination of the entire record, as well as our dissenting colleague. On page 19 of the dissent our colleague

points out that the Seward School Board has not shown that appellants "knowingly or recklessly" made false statements in the open letter. In this connection it should be pointed out that at the time the Seward School Board made its findings and conclusions New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 had not been decided and "knowingly or recklessly" had not been established as a legal criterion. It should be noted that the Seward School Board did find that certain of the statements were false and took disciplinary action as a result thereof. It should also be mentioned in connection with the dissent's comment on page 19 that a review of the record as a whole furnishes considerable basis for concluding that classroom performance and administrative operations of the Seward schools were detrimentally affected by the activities of appellants. The fact that particular questions were not asked of the witnesses to elicit an answer which would specifically state that the schools' operations were detrimentally effected has no bearing on the situation. The witnesses were required, as in all hearings, to testify to what they saw or heard or did. Their conclusions as to the effect would not generally be admissible as usurping the functions of the hearing tribunal.

The appendix to the dissenting opinion reviews the favorable testimony elicited from the appellants and witnesses produced by the appellants. Unless read in connection with the testimony produced as a whole it can only present a distorted picture.

After due consideration of the facts of this case in the light of the guidelines of *Pickering* we must order that our judgment herein be reinstated. So ordered.

RABINOWITZ, Justice (dissenting).

In dissenting in Watts v. Seward School Board,[1] I reached the conclusion that the school board's nonretention of appellants violated their rights of free speech under

1. 421 P.2d 586, 610–623 (Alaska 1967).

both the Alaska and federal constitutions.[2] In my view, Pickering v. Board of Education [3] does not necessitate abandonment, or modification, of the free speech conclusions I previously reached, nor does that case mandate that Alaska's constitutional provisions pertaining to free speech be construed in precisely the same manner as *Pickering's* interpretation of the first amendment. I therefore adhere to the position I previously adopted and hold that the school board's nonretention of appellants violated their rights of free speech under article I, section 5 of the Alaska constitution.

I find that I am also in accord with the views expressed by Mr. Justice Douglas and Mr. Justice Black in Watts v. Seward School Board [4] where they concluded that this court's judgment in Watts v. Seward School Board [5] should be reversed outright for the reasons stated by Mr. Justice Douglas in his concurring opinion in Pickering v. Board of Education.[6]

Before explaining my reasons for differing with the majority's holding that the nonretention of appellants should stand even in the light of *Pickering's* guidelines, reference will be made to some preliminary matters.

I believe it of some importance to briefly mention what this case does involve, as well as what is not involved. Originally, appellants were nonretained on the basis of four asserted acts of immoral conduct, namely, aiding in the printing and distributing of the May 18, 1959, Open Letter; signing and "carrying to the people" a false petition for the recall of the Seward School Board; appellant Blue's appearance before a union meeting where he stated, "We have been unable to get rid of the Superintendent, so we are going to get rid of the Board"; and appellant Watts' "taking part in and encouraging clandestine activities of teachers with the purpose of ousting the Superintendent."[7]

2. Art. I § 5 of the Alaska constitution provides:

> Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right. *See also* the 1st and 14th Amendments to the United States Constitution.

3. 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed. 2d 811 (1968).

4. *Id.*, 391 U.S. 592, 88 S.Ct. 1753, 20 L.Ed.2d at 842.

5. 421 P.2d 586 (Alaska 1967).

6. 391 U.S. 563, 575, 88 S.Ct. 1731, 1738, 20 L.Ed.2d 811, 821 (1968). Mr. Justice Douglas' concurring opinion in which Mr. Justice Black concurred, reads in part as follows:

> Mr. Justice Douglas * * * concurs in the judgment of the Court for the reasons set out in his concurring opinions in Time, Inc. v. Hill, 385 U.S. 374, 401, 87 S.Ct. 534, 548, 17 L.Ed.2d 456 [474], Rosenblatt v. Baer, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 [606], and Garrison v. Louisiana, 379 U.S. 64, 80, 85 S.Ct. 209, 218, 13 L. E.2d 125, 136, and in the separate opinions of Mr. Justice Black in Curtis Publishing Co. v. Butts, 388 U.S. 130, 170, 87 S.Ct. 1975, 1999, 18 L.Ed.2d 1094 [1120], and New York Times Co.

v. Sullivan, 376 U.S. 254, 293, 84 S.Ct. 710, 733, [11 L.Ed.2d 686, 716, 95 A.L.R.2d 1412].

7. 421 P.2d 586, 592 (Alaska 1966). The bill of particulars which were furnished appellants asserted that their immoral conduct consisted of the following acts:

> (1) Assisting in the printing and distribution of false, distorted, and misleading statements against the Superintendent of the Seward Public Schools with the intent of injuring his professional standing and destroying community and pupil confidence in the administration of the schools.

> (2) By carrying to the people of the community and personally signing a petition for recall of the Seward School Board on false charges.

> (3) By appearing before a union meeting in Seward and making false and misleading statements relating to the actions of the Seward School Board and making a statement similar to:

> 'We have been unable to get rid of the Superintendent, so we are going to get rid of the Board.' (Applicable to Appellant Blue only.)

> (4) By taking part in and encouraging clandestine activities of teachers with the purpose of ousting the Superintendent. (Applicable to Appellant Watts only.)

On the first occasion that this case reached this court it was held that there was substantial evidence to support the Seward School Board's findings that appellant Watts

> had solicited other teachers to join in an attempt to oust the school superintendent from his job and that Watts' conduct tended to bring him and the teaching profession into public disgrace or disrespect.[8]

This court further held in the first *Watts* case that there was substantial evidence to support the school board's findings that appellant Blue's speech to the labor union was tantamount to immoral conduct. In articulating "cause" for teacher nonretention, our legislature had defined the term "immorality"

> as conduct of the person tending to bring the individual concerned or the teaching profession into public disgrace or disrespect.[9]

Two additional facets of the first *Watts* opinion are of significance. The superior court, acting as an intermediate appellate court, held as a matter of law that neither appellants' circulation of the Open Letter of May 18, 1959, nor their circulation of the recall petition constituted "immoral conduct" under AS 14.20.170(a) (2). The superior court's rulings in regard to the May 18, 1959, Open Letter and the recall petition were never appealed to this court by the Seward School District and played no role in the first *Watts* opinion.[10]

After appellants had petitioned the United States Supreme Court for certiorari, the Alaska legislature redefined "immorality" as ground for the revocation of a teacher's certificate and added a new section pertaining to the right of teachers to engage in comment and criticism as to school matters outside of school hours.[11] In regard to the right of teachers to comment or criticize, our legislature provided:

> No rule or regulation of the commissioner of education, a local school board, or local school administrator may restrict or modify the right of a teacher to engage in comment and criticism outside school hours, relative to school administrators, members of the governing body of any school or school district, any other public official, or any school employee, to the same extent that any private individual may exercise that right.[12]

As to appellants' petition for certiorari, the Supreme Court of the United States concluded it was appropriate to remand the case to this court in order to permit us to consider the effect of these legislative changes upon the case at bar.[13] Upon remand a majority of this court upheld the nonretention of appellants on the ground that there was substantial evidence to support the school board's findings that appellant Watts' solicitation of the Framptons fell within the ambit of AS 14.20.170(a) (2)'s definition of "immorality";[14] that appellants' failure to comply with Regula-

---

8. Watts v. Seward School Bd., 395 P.2d 372, 375 (Alaska 1964).

9. AS 14.20.170(a) (2).

10. 395 P.2d 372, 375 (Alaska 1964). In the first *Watts* opinion it was stated that:
   We find it unnecessary to rule on the finding below that further cause for nonretention of the appellants was their alleged noncompliance with School Regulation E-7.

11. AS 14.20.090(2) (SLA 1965, ch. 41, § 1) defined immorality for purposes of revocation as
   the commission of an act which, under the laws of the state, constitutes a crime involving moral turpitude.

12. AS 14.20.095 (1965).

13. Watts v. Seward School Bd., 381 U.S. 126, 127, 85 S.Ct. 1321, 14 L.Ed.2d 261, 262 (1965).

14. Watts v. Seward School Bd., 421 P.2d 586, 598 n. 24 (Alaska 1967). In this second opinion the majority noted:
   There was no direct testimony that Watts had solicited teacher Monty Richardson during school hours, or that he had actually solicited the cooperation of teacher E. G. Naegel, although his representations to Naegel were made during school hours and on school premises.

tion E–7 of the Seward School Board represented a sufficient independent cause for their nonretention;[15] that appellants' roles in the compilation, reproduction, and distribution of the May 18, 1959, Open Letter constituted immoral conduct;[16] and that the subsequent legislative changes in our education laws did not require modification of the court's initial decision. In the second *Watts* opinion it was also decided that appellant Blue's speech to the union was constitutionally protected and therefore did not furnish a basis for his nonretention. The majority reasoned that although on review of the whole record there was substantial evidence to sustain the school board's conclusion that Blue's statement to the longshoremen that, "We have been ununable to get rid of the Superintendent, so we are going to get rid of the Board" constituted immoral conduct.

[T]he constitutional question becomes a close one which should be resolved in appellants' favor in view of the fact that the record contains no evidence that false or misleading statements were made, in fact, contains no evidence of

anything that was said at the meeting except the statements under consideration and that the speech was not made on school premises during school hours.[17]

The foregoing in short constitutes the history of this litigation. What is absent in the record is any parallel to the contemporary activities which have convulsed, disrupted, and at times destroyed academic institutions throughout this country. In the case at bar the record is completely devoid of evidence that any interference occurred with the actual instruction of students in attendance at any of the institutions which comprised the Seward School System. Nor was any evidence presented that the school board's, or superintendent's, actual administration of the school system was disturbed by the conduct of appellants. For here there was no physical seizure of buildings or school offices; no attempts were made by faculty members to interfere with the actual administration of the schools or with the students' right to attend school; nor was the school board, or the superintendent, presented with a series of nonnegotiable demands as an alternative to continued dis-

15. AS 14.20.170(a) (3) provides that a cause for nonretention of a teacher is substantial noncompliance with the school laws of the state, the regulations or by-laws of the department, the by-laws of the district, or the written laws of the superintendent.

16. As I pointed out in my dissent in Watts v. Seward School Bd., 421 P.2d 586, 610–613 (Alaska 1967), I noted the fact that no party had appealed from or briefed the question of the correctness of Superior Court Judge James M. Fitzgerald's ruling that appellants' role in the preparation and distribution of the May 18, 1959, Open Letter was not immoral conduct. The majority's reversal of Judge Fitzgerald's ruling in this context was explained at 609:

It is argued that the majority should not have reconsidered the trial court's order with respect to the circulation of the Open Letter. This view must be considered in the light of the fact that appellants specifically requested that the case be considered de novo * * *.

*Compare* the majority's subsequent approach in the third *Watts* opinion, 423

P.2d 678 (Alaska 1967), which was rendered upon appellants' petition for rehearing. There appellants in their petition for rehearing sought to attack the constitutionality of Regulation E–7. In holding that such an issue could not be raised for the first time, the majority stated in part at 679:

This court has held it will not consider matters on appeal * * * which have not been presented [and briefed] in compliance with Supreme Court Rules 9(e) and 11(a) (5), (6), and (8).

17. Watts v. Seward School Bd., 421 P.2d 586, 607 (Alaska 1967). The foregoing constitutes a truncated outline of the litigation involved in the case at bar. For a full exposition of the matters referred to see Watts v. Seward School Bd., 395 P.2d 372 (Alaska 1964); Watts v. Seward School Bd., 421 P.2d 586 (Alaska 1967); Watts v. Seward School Bd., 423 P.2d 678 (Alaska 1967); Blue v. Stockton, 355 P.2d 395 (Alaska 1960); and also Swick v. Seward School Bd., 379 P.2d 97 (Alaska 1963).

ruption of school administration and operation. Here we are concerned solely with speech and with speech that occurred for the most part at a time when the students of the Seward School System had already begun their summer vacation.

At this point brief reference to the type of dissident public servant involved here is appropriate. Appellant Walter B. Blue was 50 years old at the time the hearings were held before the Seward School Board in November 1960. He was married, had one child, and had been a school teacher for 15 years in the Seward School System. Appellant Blue had been a lifetime resident of the city of Seward. In response to a question which asked if "teachers are less entitled to complain [publicly] of a School Board than ordinary citizens," appellant Blue replied:

> I think that their position is identical with perhaps this exception, that being closer to the problems that perhaps they should make extended efforts first before publicizing the thing. The very thing we did throughout our history.

Just prior to giving this testimony, appellant Blue had explained that a teacher's "right to freedom of speech should be identical to all other citizens. In fact, I think that sometimes they may have an obligation

in that direction."[18] The record also shows that at the time of the November 1960 hearings, appellant James A. Watts was 47 years old, had been a teacher for 12 years, had lived in Seward for 9 years, and had taught in the Seward School System for 7 years.

Turning now to Pickering v. Board of Education [19] and the task of considering the case at bar in relation to that case, I believe the majority has overlooked an important aspect of *Pickering* in their statement of that case. In the words of Mr. Justice Marshall, Pickering's letter "charged the superintendent of schools with attempting to prevent teachers in the district from opposing or criticizing the proposed bond issue."[20] In the letter which appellant Pickering wrote to the local newspaper, he stated in part:

> Did you know that those letters had to have the approval of the superintendent before they could be put in the paper? That's the kind of totalitarianism teachers live in at the high school, and your children go to school in.
>
> \*   \*   \*   \*   \*   \*
>
> I must sign this letter as a citizen, taxpayer and voter, not as a teacher, since that freedom has been taken from the teachers by the administration. Do you

---

18. At another point in his testimony appellant Blue elaborated in more detail as to his philosophy. He testified that:

    In my function as a teacher of Social Studies, I have the responsibility of teaching such things as freedom of speech, freedom of in general, the American tradition of democracy. As a matter of fact, in becoming involved in the whole teacher's controversy, this underlay the entire motivation for involving myself at all. If I am to teach these things to students, I believe it is my obligation to practice what I preach, if I possibly can. Ordinarily I have not become involved in controversies, but when I saw the 4 non-retained teachers abandoned, without respect to their rights, as I understood it, this was back in the Seward District Teachers Association, I had to make a decision about moral responsibility.

19. 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed. 2d 811 (1968).

20. Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed. 2d 811, 816 (1968). Later in the opinion Mr. Justice Marshall stated, 391 U.S. at 569, 88 S.Ct. at 1735, 20 L.Ed.2d at 818:

    An examination of the statements in appellant's letter objected to by the Board reveals that they, like the letter as a whole, consist essentially of criticism of the Board's allocation of school funds between educational and athletic programs, *and of both the Board's and the superindent's method of informing, or preventing the informing of, the district taxpayers of the real reasons why additional tax revenues were being sought for the schools.* (emphasis added)

really know what goes on behind those stone walls at the high school?[21]

In my view appellant Pickering's attack on the superintendent of schools was just as unpleasantly sharp as the attack which was made upon Superintendent Fabricius in the Open Letter of May 19, 1959. All of which has led me to the conclusion that even under the *Pickering* criteria appellants' rights of free speech were abridged by virtue of their nonretention by the Seward School Board. For, as in the case at bar, the board in *Pickering* had charged

> that numerous statements in the letter were false and that the publication of the statements unjustifiably impugned the 'motives, honesty, integrity, truthfulness, responsibility and competence' of both the Board and the school administration. The Board also charged that the false statements damaged the professional reputations of its members and of the school administrators, would be disruptive of faculty discipline, and would tend to foment 'controversy, conflict and dissension' among teachers, administrators, the Board of Education, and the residents of the district.[22]

In *Pickering* the board, after a full hearing, determined that the publication of the letter was "detrimental to the efficient operation and administration of the schools of the district."[23] These facets of the *Pickering* case appear to me to be strikingly similar to the case at bar and possesses relevance in the resolution of the free speech issues under *Pickering*.[24] For in *Pickering* the crucial problem was conceiv-

ed as one requiring the balancing of "the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[25] In *Pickering* the Supreme Court concluded that what they had before them was a

> case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public.[26]

On the basis of the foregoing, the Supreme Court held that

> absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment.[27]

My review of the record here has led me to conclusions similar to those which the Supreme Court of the United States reached in the *Pickering* case. For here

---

21. Pickering v. Board of Educ., 391 U.S. 563, 576, 88 S.Ct. 1731, 1739, 20 L.Ed. 2d 811, 822–823 (1968).

22. *Id.*, 391 U.S. at 566, 88 S.Ct. at 1734, 20 L.Ed.2d at 816.

23. *Id.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L. Ed.2d at 815.

24. *Id.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L. Ed.2d at 817.

25. *Id.* This balancing test followed from the Supreme Court's recognition that:
'[T]he theory that public employment which may be denied altogether may be

subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' Keyishian v. Board of Regents * * *. At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.

26. *Id.*, 391 U.S. at 572, 88 S.Ct. at 1737, 20 L.Ed.2d at 819–820 (footnote omitted).

27. *Id.*, 391 U.S. at 574, 88 S.Ct. at 1738, 20 L.Ed.2d at 821 (footnote omitted).

there is no showing that appellants' statements in any way impeded any teacher's proper performance of his, or her, daily duties in the classroom, or interfered with the regular operation of the schools. In addition to the absence of an overriding state interest, my study of the record has led me to conclude that the Seward School Board has not shown that appellants knowingly or recklessly made false statements in the Open Letter of May 18, 1959.

I think it important to an understanding of the case to note that the May 18, 1959, Open Letter did not initiate the controversy which eventually led to the defeat of the recall petition. This is apparent from a study of the entire record, as well as from reading the text of the second paragraph of the Open Letter which reads:

> The Seward Local [of the American Federation of Teachers, affiliated with the AFL-CIO] takes this means of informing the Seward School Board (and the public) of our stand in the current struggle for a good school. We hold that incidents occurring during the last year have reached such proportions as to be definitely detrimental to the morale of our teaching staff and the effectiveness of the local educational system.

The Open Letter speaks in terms of "current struggle" and incidents which had occurred during the last year. The record reflects the accuracy of these characterizations. The 10 accusatory paragraphs of the Open Letter all pertain to past events which appellants' union had conceived of reaching such proportions as to be detrimental to teachers' morale and the effec-

tiveness of the local educational system. Further, the record reflects that for many months prior to the composing, printing, and circularization of the Open Letter several of the matters covered in the 10 accusatory paragraphs were the subject of public attention and had been brought before the School Board.[28]

I believe it also pertinent to point out that much of the public discussion which occurred after the publication and distribution of the Open Letter was engendered by the petition for recall of the Seward School Board.[29] And, as I have previously mentioned, the law of the case at bar has established that circularization of the petition for recall did not constitute immoral conduct. Thus, in my view, any references to public debate which centered on the recall petition, or to any actions of the appellants, or Superintendent Fabricius in regard to the recall petition, are not relevant to disposition of this case under *Pickering* because it has been established that dissemination of the petition for recall by appellants was protected by virtue of the superior court's ruling.

Turning to the particular statements in question, I cannot discern how appellant Watts' solicitation of the Framptons resulted in any impediment to the latters' proper performance of their daily duties in the classroom (assuming Benjamin Frampton had classroom duties in addition to those encompassed within the position of principal of the Seward elementary school) or interfered with the regular operation of the schools generally.[30] I stated in my previous dissent in the second *Watts* case, assuming that the board cor-

28. Further reference to this subject will be made in the appendix to this opinion.

29. In Blue v. Stockton, 355 P.2d 395 (Alaska 1960), this court held that a member of a city school board is an elected public official of an incorporated municipality and was therefore subject to the recall provisions contained in the applicable state statute.

30. In Watts v. Seward School Bd., 421 P.2d 586, 598 n. 24 (Alaska 1967), the majority stated:

> There was no direct testimony that Watts had solicited teacher Monty Richardson during school hours, or that he had actually solicited the cooperation of teacher E. G. Naegel, although his representations to Naegel were made during school hours and on school premises.

rectly resolved any conflicts in favor of the Framptons, that:

> After Watts made known his purpose, the Framptons unequivocally rejected Watts' request to join the movement and then and there articulated their support of the superintendent. * * *
>
> * * * Here all that was involved was speech directed toward requesting help in bringing about a change in school administration.[31]

Nothing in the record which pertains to appellant Watts' conversations with Monty Richardson or E. G. Naegel compels any different conclusions from those I have drawn in regard to the Frampton conversations. Again, all that is involved here is speech, the contents of which there is no issue as to truth or falsity. Additionally, it has not been shown that any overriding interest of the state was affected by these conversations. For the record is barren of any evidence that either Richardson's, Naegel's, or the Framptons' classroom performances were adversely affected or that the administration or operation of the Seward School System was impeded in any manner. In such circumstances I am of the view that appellant Watts' "clandestine solicitations" were constitutionally protected under the *Pickering* criteria.

In regard to the contents of the Open Letter, my "independent"[32] examination of the whole record has led me to conclude that the board has not shown that appellants knowingly or recklessly made false statements in this letter.[33] Given this conclusion, and absent any showing of impediment to classroom performance or administrative operation of the Seward schools, I reach the result that the Open Letter comes within the ambit of the protection accorded by *Pickering* to the right of public school teachers to speak freely on issues of public importance.[34] For in *Pickering* the Supreme Court once again reiterated its belief that the primary value embodied in the Free Speech Clause of the first amendment is the "public interest in having free an unhindered debate on matters of public importance."[35] Also recognized in *Pickering* is the fact that the "threat of dismissal from public employment is * * * a potent means of

31. *Id.* at 615.

32. Pickering v. Board of Educ., 391 U.S. 563, 579, 88 S.Ct. 1731, 1740, 20 L.Ed.2d 811, 823 n. 2 (1968), where the court said:
> This Court has regularly held that where constitutional rights are in issue an independent examination of the record will be made in order that the controlling legal principles may be applied to the actual facts of the case. E. g., Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Pennekamp v. State of Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L. Ed. 1295 (1946); New York Times Co. v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686, 709, [95 A.L.R.2d 1412] (1964). However, even in cases where the upholding or rejection of a constitutional claim turns on the resolution of factual questions, we also consistently give great, if not controlling weight to the findings of the state courts. In the present case the trier of fact was the same body that was also both the victim of appellant's statements and the prosecutor that brought the charges aimed at securing his dismissal. The state courts made no independent review of the record but simply contented themselves with ascertaining, in accordance with statute, whether there was substantial evidence to support the Board's findings.

33. Although it appears that the authorship of the May 18, 1959, Open Letter was a cooperative effort by several members of the Seward Local of the American Federation of Teachers, both appellants at various points in their testimony assumed full responsibility for the text of the Open Letter.

34. In the appendix of this dissent I have set forth in greater detail the basis for my conclusion that the record does not demonstrate that appellants knowingly or recklessly made false statements critical of their ultimate employer and supervisor.

35. Pickering v. Board of Educ., 391 U.S. 563, 573, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811, 820 (1968).

inhibiting speech." [36] Concerning the former precept, I differ with the majority's conclusion that in order for an issue to qualify as one of public importance it must concern a matter on which the public directly voted. I view this as too narrow an interpretation of *Pickering* and do not believe the Court intended such a limitation on its holding. For I think that the essential core of the 10 accusatory paragraphs of the Open Letter dealt with issues concerning matters of public importance, i. e., irregular employment-contractual practices on the part of the school board; safety of school students and buildings; and performance of the school board's chief executive officer. Admittedly, the text of the Open Letter did not deal primarily with matters of public record which could easily be corrected by the school board. Here the Open Letter treated subjects which were, for the most part, related to the daily operations of the school system. Yet I believe that this single factor is insufficient, in and of itself, to divest the Open Letter of its constitutional protection, particularly in light of the conclusions I have heretofore reached that no showing has been made that appellants either knowingly or recklessly made false statements in this letter. It is my belief that society has a compelling need for informed criticism from its public school teachers in order to effectuate the first amendment's emphasis on the attainment of free and unhindered debate on matters of such importance as education.[37] I do not think that on this record society's need is outweighed by the fact that the Open Letter concerned several topics which were not matters of public record.

This brings me to the question of Regulation E–7 of the Seward School Board. Regulation E–7 of Section I of the Seward School Board provides:

> Grievances, complaints and communications from employees shall be submitted to the Board through the Superintendent. Any employee or group of employees may at any time appeal to the Board.

Regulation E–9 of the board's regulations reads as follows:

> Employees or groups of employees desiring to address the Board shall address their communication to the Superintendent and not to the individual members of the Board, except that copies of any communication may be sent to all Board members.

In the majority's opinion in the case at bar, appellants' asserted violation of Regulation E–7 is impliedly reaffirmed as a separate and independent ground for their nonretention. Furthermore, the majority has again declined to consider the question of the constitutionality of Regulation E–7.

In my dissent in Watts v. Seward School Board [38] I set forth in detail why I was in disagreement with the majority's conclusion that appellants' circulation of the Open Letter constituted "substantial noncompliance" with the school board's regulation.[39]

---

36. *Id.*

37. Not involved in the case at bar is any issue of breach of confidentiality. Nor does the text of the Open Letter furnish indicia of the unfitness of the appellants to carry out their duties as school teachers. Also absent in respect to the employment relationship between appellants and the Board, and appellants and the superintendent, is any employment relationship for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning.

The record is devoid of evidence as to the effect of the Open Letter on the general public. The evidence we do have as to the effect on the public stemming from the circularization of the recall petition, and the actions in support and against the same, are not relevant to disposition of the case under *Pickering* for it has been established that the circularization of the petition was not immoral conduct as a matter of law.

38. 421 P.2d 586, 615–616 (Alaska 1966).

39. As 14.20.170(a) (3) provides that a cause for nonretention of a teacher is substantial noncompliance with the school laws of the state, the regulations or by-laws of the department, the by-laws of the district, or the written rules of the Superintendent.

After alluding to the uncertainties and ambiguities inherent in Regulations E–7 and E–9, I stated:

> Two other factors also lead me to differ with the majority's holding in regard to Regulation E–7. First, there is nothing in the text of Regulation E–7 which prohibits an employee from making a public disclosure of any grievance, complaint, or communication which he has submitted to the Board, and as is pointed out subsequently, education, and in particular administration of our schools, is a public issue as to which freedom of discussion is essential to the formation of public opinion. Secondly, in the crucial period during the weeks prior to the circulation of the Open Letter, the Seward School Board and the Superintendent had met with committees of the Seward District Teachers' Association in regard to grievances pertaining to the nonretention of certain teachers. At no time during this period did either the Seward School Board or the Superintendent require compliance with Regulation E–7 as a procedural prerequisite to the Board's receiving and hearing grievances, complaints, or communications from individuals.
>
> In such circumstances I believe it to be basically unjust to hold appellants to the letter of Regulation E–7 which is ambiguous when read in conjunction with Regulation E–9 and one that had been, in practice, consistently disregarded by the Board during the period of time immediately preceding appellants' circulation of the Open Letter.[40]

I think it bears repeating that on the basis of the facts just mentioned appellants' noncompliance with Regulation E–7 cannot be used as a basis for sustaining their nonretention. Lacking here is any notice from the Seward School Board, or the superintendent, to appellants that adherence to Regulation E–7 would be insisted upon. This absence of notice is crucial in light of the board's own disregard of the Regulation E–7 in the period of time which preceded the distribution of the Open Letter.[41] In such circumstances, I cannot find that appellants' noncompliance with Regulation E–7 can be used as a sanction against exercise of their right of speech.

In regard to the question of the constitutionality of Regulation E–7; the Supreme Court said in *Pickering*:

> There is likewise no occasion furnished by this case for consideration of the extent to which teachers can be required by narrowly drawn grievance procedures to submit complaints about the operation of the schools to their superiors for action thereon prior to bringing the complaints before the public.[42]

Although *Pickering* itself did not involve any regulation issue, the Supreme Court apparently intended the above as a reference to this court's decision in *Watts*.[43] I therefore find it difficult to ignore the constitutional issues which pertain to Regulation E–7.

In my view Regulation E–7 is overbroad in the constitutional sense. In Keyishian v. Board of Regents,[44] the Supreme Court of the United States wrote:

> [P]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms * * * [f]or standards of permissible statutory vagueness are strict in the area of free expression. * * * Because First Amendment freedoms need breathing space to

---

40. Watts v. Seward School Bd., 421 P.2d 586, 616 (Alaska 1966).

41. *Compare* Meehan v. Macy, 129 U.S.App. D.C. 217, 392 F.2d 822, 837 (1968); Monahan v. United States, 354 F.2d 306, 310, 173 Ct.Cl. 734 (1965).

42. Pickering v. Board of Educ., 391 U.S. 563, 573, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811, 819 n. 4 (1968).

43. *Watts* was argued the day before *Pickering* was argued to the Supreme Court of the United States.

44. 385 U.S. 589, 603, 87 S.Ct. 675, 684, 17 L.Ed.2d 629, 641 (1967).

survive, government may regulate in the area only with narrow specificity.[45]

Here the regulation in question required the submission of *all* communications, complaints, and grievances addressed to the school board through the superintendent. Neither Regulation E–7 nor the related regulation of the board authorized at any time, or under any circumstances, disclosure of the text of any such communication, complaint, or grievance to the members of the public at large.[46] As the Supreme Court said in *Keyishian,*[47] "The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed." I therefore conclude that Regulation E–7 is overbroad and ambiguous in light of Regulation E–9, and in factual context of this case cannot furnish any basis for appellants' nonretention.

In response to the majority's comments concerning this dissent, I believe the following observations are pertinent. I do not view the conclusion that reversal of the school board is warranted as tantamount to prospectively undermining the authority of each and every state school board. This characterization of the majority ignores the rights given teachers by AS 14.20.095 to criticize school administrators and members of the governing body of any school district and equates criticism with the undermining of authority.

In regard to the "distorted picture" produced by independent examination[48] of the record, I tend to agree with Mr. Justice White that there are problems in exercising this type of review at the appellate level.[49] In applying the standard of review called for by *Pickering,* I have merely set forth the evidence which led me to the conclusion that appellants had not knowingly or recklessly made false statements in the Open Letter. In marshalling this evidence, I refrained from attempting to resolve conflicts in evidence where present (i. e., Watts' testimony when compared with the Framptons) because of the factor of demeanor.

I believe the majority's reference to appellant Blue's beliefs concerning God is particularly unfortunate. A somewhat more expanded reference to the record reveals more fully the man, his philosophy, and gives the same insight into the nature of the hearing which was conducted before the school board.[50] The record shows that the following occurred during the examination of appellant Blue by the attorney for the school board:

SCHOOL BOARD ATTORNEY: I should like to call Mr. Blue for several

---

45. *See also* Whitehill v. Elkins, 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967); Albaum v. Carey, 283 F.Supp. 3, 11 (E.D. N.Y.1968); Vogel v. County of Los Angeles, 68 Cal.2d 18, 64 Cal.Rptr. 409, 434 P.2d 961 (1967); Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1039, 1050 (1968).

46. No regulation explicitly prohibited publication to the public. Assuming a communication involving a compelling degree of urgency, Regulation E–7 fails to provide any time limits under which the board must act before the teacher would be permitted to inform the public in general. *See also* Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1039, 1071 (1968).

47. Keyishian v. Board of Regents, 385 U.S. 589, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629, 641 (1967).

48. *See* n. 32 *supra.*

49. *See* Mr. Justice White's separate opinion in Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed. 2d 811, 825–27 (1968).

50. In our recent opinion in Flores v. State, 443 P.2d 73, 77 (Alaska 1968) (footnote omitted), this court said in part:

Today the theological underpinnings of the oath requirement have largely been removed, both through statutory provisions for affirmation, and by holdings to the effect that religious belief is not an essential prerequisite of the witness' competency.

On the facts of this record we hold that the witness Gilbert was not rendered incompetent because of his statement that he did not believe in God.

questions, please. I should like to remind you Mr. Blue that you're still under oath as a witness.

MR. BLUE: I understand that sir, thank you.

SCHOOL BOARD ATTORNEY: Speaking of oaths, Mr. Blue, you took an oath to tell the truth, the whole truth and nothing but the truth, so help you God, and in that regard I should like to ask you whether or not you do believe in God?

MR. BLUE: Yes, sir, I do.

SCHOOL BOARD ATTORNEY: Have you always had this

MR. BLUE: I beg your pardon, sir, I can—will you read the question, please?

SCHOOL BOARD ATTORNEY: Well, I asked you if you believed in God?

MR. BLUE: Mr.—

SCHOOL BOARD ATTORNEY: The same God that we made reference to when you took the oath to tell the truth.

MR. BLUE: * * * this is a tremendous problem with me, really—it's a tremendous problem to me and really a difficult problem to answer and I have given a good deal of thought to it. I have done a good deal of discussing on it and I can't categorically say that God exists, nor can I deny the existence of God. It comes down simply to a matter of honestly I don't know and I wish I would. This is an extremely important problem and I would like to know, but I'm afraid that I do not have an actual conviction, I'm still wrestling this problem.

SCHOOL BOARD ATTORNEY: As an educated man, now, Mr. Blue, you recognize the distinction between an atheist and an agnostic, don't you?

MR. BLUE: Yes, I do.

SCHOOL BOARD ATTORNEY: Would you categorize yourself in the latter category?

MR. BLUE: Well, what I have said, I'm afraid, places me in that category, yes, sir.

*    *    *    *    *    *

SCHOOL BOARD ATTORNEY: This is the first time—I'm not using the document as such. I have no objections if the document is not introduced at all in the record. I should like to ask the witness the question of if he has ever made reference to the Bible as a book of fables, without regard to the Millers. I can care less about the Millers.

MR. BLUE: No sir, I have not in those words.

SCHOOL BOARD ATTORNEY: You deny ever making a statement to that effect, then?

MR. BLUE: No sir I don't, not to that general effect, but that's a distorted version.

SCHOOL BOARD ATTORNEY: Well, give me your version, Mr. Blue?

MR. WALTON: I'm going to object to any further questioning along this line unless the Board will stipulate that this was one of the reasons for nonretention of Mr. Blue. If the Board will stipulate to that, [the school board attorney] may gladly inquire. If it wasn't one of the reasons for nonretention, then it's highly improper.

SCHOOL BOARD ATTORNEY: I submit this has a relevance insofar as it bears on this man's reliability as a witness.

MR. WALTON: [The school board attorney] as a lawyer knows very well that any such question is wholly and highly improper. But I'm first going to ask the Board to rule on my question, will the Board stipulate to me that this is one of the reasons he was non-retained. [The school board attorney] advises that the Board will not so stipulate, is that it?

*    *    *    *    *    *

SCHOOL BOARD ATTORNEY: For the Board, Mr. Walton, I'll make this statement, if Mr. Casey doesn't subscribe to it, he can stop me. This interrogation has nothing to do the grounds that was stated for nonretention in the bill of particulars, it has only to do with his capacity as a witness and whether or not the oath that he took has any significance insofar as it might relate to the reliability of his testimony.

\* \* \* \* \* \*

MR. WALTON: Very well, then ask the question, I'll not object. Ask him if his oath does mean anything to him.

SCHOOL BOARD ATTORNEY: Does this oath mean anything to you, Mr. Blue?

MR. BLUE: Which oath are you referring to sir, the oath

SCHOOL BOARD ATTORNEY: The oath that was administered to you by your counsel when you testified?

MR. BLUE: Yes sir, it means a very great deal to me.

SCHOOL BOARD ATTORNEY: What does it mean to you?

MR. BLUE: It means exactly this, that I am honor bound to tell the truth on the standard generally accepted by people as the most important standard of all to swear by.

SCHOOL BOARD ATTORNEY: What people—what is important to swear by? What are you talking about?

MR. BLUE: People, I suppose when they swear, swear by that they hold to be honorable and fine and good. I believe when people believe in God that then this is their standard and if they make a solemn or binding statement, they usually make an oath or swearing, may God's thunderbolt strike me dead unless I am telling the truth or so forth, is merely a way to me affirming that their intent to tell the truth is direct and honorable. I intend to tell the truth and

I shall do so to the best of my ability and if God will help us I certainly will be most happy to accept that help.

SCHOOL BOARD ATTORNEY: You're not disdaining His help, but you're not going to solicit it, is that it?

MR. BLUE: I certainly would solicit it if I felt that would do me good.

SCHOOL BOARD ATTORNEY: Have you made any attempt to engender your students to this philosophy, Mr. Blue?

MR. WALTON: I object to the line of questioning. [The school board attorney] was supposed to be interested in the question of what this oath means to this witness.

SCHOOL BOARD ATTORNEY:

All right, I'll go back to the question in issue here. Sir, when you take an oath to tell the truth, the whole truth and nothing but the truth, so help you God, can you omit the last part of it and you would feel just as bound to tell the truth as if you understand it without reference to God?

MR. WALTON: I'm going to object to this line of questioning.

It may very well be that the Seward School Board did in fact view appellant Blue's testimony in regard to his religious beliefs as not "commendable." But, in my opinion, this misses the point. The above portions of the school board attorney's examination of appellant Blue strike me as being highly prejudicial and calculated to distract the board from reaching a decision on the real merits of the controversy it was asked to decide.

In conclusion, I am of the opinion that appellants' rights of free speech under both the United States Constitution and the Alaska constitution were violated under the criteria of *Pickering* and that Regulation E–7 does not provide an independent basis for upholding the nonretention of appellants.

## APPENDIX

### THE MAY 18, 1959, OPEN LETTER TO THE SEWARD SCHOOL BOARD

This letter began with the following two introductory paragraphs:

A Seward Branch of the American Federation of Teachers, affiliated with the AFL-CIO, has applied for and received confirmation of its charter. The AFT is a recognized organization of professional teachers and thereby commands recognition by the Seward School Board.

The Seward Local takes this means of informing the Seward School Board (and the public) for our stand in the current struggle for a good school. We hold that incidents occurring during the last year have reached such proportions as to be definitely detrimental to the morale of our teaching staff and the effectiveness of the local educational system.

Following this introduction are 10 paragraphs which I have characterized as accusatory in nature. The portions of the record which have led me to conclude that appellants did not knowingly or recklessly publish false statements in the Open Letter of May 18, 1959, in regard to these 10 paragraphs are as follows:[1]

#### *Paragraph 1.*

Illegal non-retention of three teachers, reflecting on the professional reputations of those involved, in violation of Section 138 of the State School Laws, which was later corrected only after the insistence of the Seward Local of the American Federation of Teachers in a public hearing with legal counsel.

The record on this point shows that Superintendent Fabricius admitted that "correct procedures and notice of termination" in regard to the nonretention of Mrs. Armstrong, Mrs. Hallenback, and Mrs. Svedlund were not followed. Appellant Watts testified that legal counsel of the National Educational Association had advised them that these teachers had been illegally nonretained. Appellant Blue testified that the Open Letter was published after the May 8, 1959, Seward School Board meeting at which the Board voted to return contracts to these nonretained teachers. This vote came after legal counsel for the American Federation of Teachers had presented the case for retention. According to Blue, "The fact that the School Board returned the contracts to the teachers was sufficient for me."

#### *Paragraph 2.*

It is a legitimate duty of administration to maintain or create harmony in the school, and the tension noted in the pupils, and the 'friction' which some of them were aware of, does not fit this requirement.

William A. Swick testified that tension mounted after Jack Conder (a teacher) was fired and the situation concerning janitor Jesse Moore developed. Mrs. Davis testified to the existence of tension. Appellant Blue detailed the history of the existing tensions from the time of the firing of Jack Conder.

#### *Paragraph 3.*

Non-compliance with the fire drill regulation requiring ten fire drills per year (Sec. III, b, 4, page 9, Rules and

---

[1]. As to the applicable scope of review, see n. 32 *supra*. In Pickering v. Board of Educ., 391 U.S. 563, 579, 88 S.Ct. 1731, 1740, 20 L.Ed.2d 811, 823 n. 1 (1968), the court said:

> We shall not bother to enumerate some of the statements which the Board found to be false because their triviality is so readily apparent that the Board could not rationally have considered them as detrimental to the interests of the schools regardless of their truth or falsity.

Although several of the accusatory paragraphs appear to fall within the "trivial" category, brief references will be made in this appendix to each of the 10 paragraphs in question. *Compare* Superintendent Fabricius' opinion that much of the substance of the 10 paragraphs was trivial.

Regulations for the school staff/local/). This applies to both school buildings, one of which is a dangerous building.

In regard to this paragraph, Superintendent Fabricius testified that its allegations were "correct" and that "we did not have 10 fire drills in accordance with regulations."

*Paragraph 4.*

Ordering the custodian, Jesse Moore, to do technical electrical work beyond his skill in a dangerous building.

Murl Trevethan, a volunteer fire inspector, made an inspection with the then Fire Chief Fred Kielcheski of the Seward School buildings. According to Trevethan, this inspection came about as a result of Our Lady of the Angels fire in Chicago. In the course of their inspection they observed hazardous conditions. Jesse Moore, the janitor, informed them that Superintendent Fabricius had advised him to do the electrical conduit work. Fire Chief Kielcheski told Moore not to do it. In this same conversation Moore told them he was not qualified to do the work of a "furnace man" or that of an electrician. At the hearing William Swick testified that appellants' exhibit 17 was dictated to him by Jesse Moore on May 7, 1959. The text of Mr. Moore's statement supports the allegations contained in paragraph 4. Although the exhibit is not part of the record before this court, the text of the exhibit appears at page 391 of the transcript.

*Paragraph 5.*

On different occasions threatening to 'get one third of the faculty this year, and half of the remainder next year' is an apparent attempt to 'purge' the faculty. Why Mr. Fabricius should have had this preconceived and hostile attitude is unknown. Teachers have raised the questions, 'How can one man, a stranger coming into a town, have the right to tamper with the livelihood of teachers, tax payers, property owners, and upset a school system in a single year's time?'

More than bringing teachers and others into public disgrace and disrespect, actions cited have jeopardized the property and investments of several people, without giving legitimate cause and without regard for their feelings and personal rights.

Mrs. Beth Muller, a 15-year resident of Seward who had three sons in the Seward School System, testified that in the fall of 1958 she had a conversation with Superintendent Fabricius, during which he told her

> he knew that the situation was bad and he felt that probably the heads would roll off about 1/3 of the teachers in the school system. * * * That he had had to clean up previous school systems and he felt that he could take care of ours too.

Murl Trevethan testified that he overheard a portion of a conversation between Fire Chief Kielcheski and Superintendent Fabricius in which the latter stated:

> I had about the same thing down at Wrangel * * * I had to clean out about 80% of them to clear it up and he said, it looks like I'm going to have to do the same thing here.

Mrs. Davis testified that Superintendent Fabricius told her he was going to get rid of all the deadwood and that two years was long enough for any school teacher. Appellant Watts testified that on April 3, 1959, Superintendent Fabricius said, "I have gotten rid of a third of the teachers this year and I expect and I'll have to get rid of half of the teachers next year. There is too much deadwood in this system."

In regard to the latter portion of paragraph 5, Charles Brown testified that as a new teacher he sought Superintendent Fabricius' advice and was told not to buy property in Seward. Subsequently, Mr. Brown was nonretained. He testified that his nonretention jeopardized his investment in the house he was purchasing in Seward.

*Paragraph 6.*

Provoking the resignation of an outstanding teacher by forbidding him to

ride the school bus in what *seems* to be a violation of the intent of the Rules and Regulations Affecting School Transportation, Page 13, Item 31, Laws of the Territory, etc., the apparent authoritarian mishandling of this resignation impairing the teacher's chances for a teaching position elsewhere. This action has placed the School Board and the taxpayers in the possible position of a suit to secure payment of the contract.

William Swick testified that the regulation in question says:

[A]ll negative, drivers must not haul any person who is not a pupil of the school, a teacher or an employee of the school, without the written consent of the school authority. We in our humble way interpreted that to mean that drivers may haul any person who is a pupil, a teacher, or an employee of the school without the written consent of the school authority.

In regard to the allegations of this paragraph, Swick further testified as to Jack Conder's qualifications and stated:

Again, all I know is what Jack told me. He came down to my house for lunch that day that he had been resigned, and he told me the details of it:

\*     \*     \*     \*     \*     \*

\* \* \* Mr. Fabricius apparently for some reason had ordered him not—ordered him, no one else, apparently, not to ride the bus \* \* \*.

As a result of Mr. Conder's riding the school bus the morning of the next school day following Superintendent Fabricius' order, the superintendent met with Mr. Conder. The superintendent's secretary transcribed their conversation. A portion of this transcript reads as follows: "Mr. Fabricius: I suggest immediately you present your resignation and I'm sure the Board will accept. Mr. Conder: Thank you."

*Paragraph 7.*

Dictatorial treatment of teachers, forcing them into the choice of submitting and taking it at the loss of personal dignity, or fighting back in public spectacle.

Concerning the assertions in this paragraph, see the references heretofore made to the resignation of Jack Conder and the reference *supra* to Terry Smith. Appellant Watts testified that in January 1959 Superintendent Fabricius called a grade school faculty meeting at which he stated:

[Y]ou the teachers association [Seward District Teachers' Association] have started a scandal campaign to try to get rid of me. \* \* \* I expect to be here long after the most of the rest of you have gone. In the spring when contracts are let I'll remember who my enemies are.

*Paragraph 8.*

Speaking in a peremptory [sic] and threatening manner in the presence of a pupil, to Mr. Smith.

Mrs. Davis testified that Mr. Smith had sent a student from study hall to Superintendent Fabricius and that in front of this student Mr. Fabricius stated to Mr. Smith: "Are you trying to tell me my business \* \* \* if you don't like it why don't you quit"? During his testimony, William Swick stated, in regard to appellants' exhibit 19 that on May 11, 1959, Mr. Smith wrote a statement to appellant Blue regarding this incident. The statement was "to be released at the discretion of the American Federation of Teachers \* \* \*." Appellant Blue testified he personally witnessed the Smith incident and testified as to what occurred.

*Paragraph 9.*

Two specific instances have occurred violating the requirement to provide Educational Leadership in the Local Regulations.

a. Neglect to permit the development of a proper music program.

b. Information relative to the Drama Festival held at Palmer was not made known to the teachers or the student body, although the school had partici-

pated ardently and with distinction the previous year.

c. This same requirement is violated in overtly or covertly driving out Mr. Conder, Mr. Swick, Mr. Smith, and possibly others who had a definite contribution to make to the functions of the school.

It is apparent that there is overlapping concerning the applicability of the evidence to many of the 10 accusatory paragraphs. This is particularly evident in regard to subsection c of this paragraph. In regard to subsection a of paragraph 9, I believe William Swick's testimony furnishes a sufficient basis for the conclusion that appellants did not knowingly or recklessly publish any false statements therein.

*Paragraph 10.*

Firing of Mrs. Davis apparently on the basis of personal dislike rather than for dereliction of duty or inefficiency. This resulted in public discussion reflecting adversely on the school, and placed Mrs. Davis in the position of consulting an attorney relative to the collection of salary allegedly due her.

Mrs. Davis testified that Superintendent Fabricius, when asked, would not give her any reasons for her firing.

I believe the following is also relevant to the issues of whether or not appellants knowingly or recklessly published false statements in the Open Letter of May 18, 1959. Appellant Watts testified that at the time he distributed the Open Letter he believed every one of the 10 paragraphs were true to "the best of his knowledge." Watts was then asked the following question by the board's attorney:

Had you thoroughly and exhaustively investigated yourself, or your group, to satisfy yourselves beyond any reasonable doubt that each of these items were true?

MR. WATTS: I have investigated many of them and others I had complete confidence in the statements from many sources on the others.

Appellant Blue testified he believed the 10 paragraphs were true in every respect "within the limits of human frailty" and "[t]o the extent that the people working on them conscientiously were able to state the truth." Both appellants testified that they believed they had exhausted all possible means of solving what they conceived to be problems before deciding to publish the Open Letter. According to appellant Watts:

The reasons it was decided and voted to publish this open letter was because our efforts to reach the school board to solve our problems about what was happening to us during the year failed. They had not met with us even after school was out in the spring after it was agreed they would meet with us. Our members were falling, would be falling rapidly within the next week—some would be going away to work, some would be going away to school and we felt we had to reach the board some way and it was our conviction, specifically my conviction that when all avenues are closed to your meeting with public officials that the ultimate authority lies with the electorate, and in using this means to reach the school board and the electorate on our problem.

Additionally, the record shows there had been negotiations between the Seward District Teachers' Association and the Seward School Board concerning the nonretention of teachers Armstrong, Hallenbeck, and Svedlund since March 1959. Appellant Blue testified that at the May 8, 1959, meeting with the school board, Pat Ervine, American Federation of Teachers' attorney, attempted to bring all the matters contained in the Open Letter (with the exception of two items) to the board's attention. Superintendent Fabricius testified that appellants were nonretained for acts which they committed after the May 18, 1959, Open Letter was circulated. In his opinion appellants were nonretained because they did not desist in their efforts after the summer of 1959.